STATE

v.

Gerard J. COLLINS.

No. 94–763–C.A.

Supreme Court of Rhode Island.

June 20, 1996.

Jane McSoley, Asst. Attorney General, Aaron Weisman, Asst. Attorney General, for Plaintiff.

Janice Weisfeld, Asst. Public Defender, Paula Rosin, Asst. Public Defender, for Defendant.

LEDERBERG, Justice.

## OPINION

This case came before the Supreme Court on the appeal of the defendant, Gerard J. Collins, from a judgment of conviction of one count of driving to endanger, death resulting; one count of driving under the influence, death resulting; four counts of driving to endanger, personal injury resulting; and four counts of driving under the influence, serious bodily injury resulting. The defendant was sentenced to serve fourteen years at the Adult Correctional Institutions, followed by sixteen years suspended with supervised probation, with an eleven-year period of license revocation to commence upon the defendant's release from prison. In addition, the defendant was ordered to perform 1,000 hours of community service on weekends in an emergency room or a trauma-care facility, within two years of his release, and to undergo alcohol/substance-abuse counseling as directed by his probation officer. On appeal, the defendant alleged four errors: (1) the admission into evidence of the results of a blood-alcohol analysis, (2) the trial justice's refusal to admit into evidence the report of an accident-reconstruction expert, (3) the trial justice's findings of guilt, and (4) the propriety of the sentence imposed. For the reasons stated below, we deny the defendant's appeal and affirm the judgment of the Superior Court. The facts insofar as relevant to the issues raised in this appeal are related below.

## Facts and Procedural History

Shortly before 1 a.m. on August 3, 1990, two automobiles collided at the intersection of Elwyn and Princess Avenues in the city of Cranston, Rhode Island. One was driven by defendant, the other by Delinda Martins (Martins). Officer William Remington (Remington) of the Cranston police department was the first to respond to the scene of the accident, where he observed two cars in the northeast corner of the intersection. The officer noted extensive damage to the front of defendant's car and to the passenger side of Martins's vehicle.

At trial Remington testified that, when he spoke to defendant, he immediately suspected that defendant was "possibly under the influence of alcoholic beverage" because Remington smelled "an obvious strong odor of alcoholic beverage" on defendant's breath and observed that defendant's "eyes were watery, bloodshot, and * * * speaking * * * with slurred speech." Remington informed defendant of his rights, including his right to an attorney and his right to refuse chemical testing, and then told defendant that he was under arrest for suspicion of driving while under the influence of alcohol. Because defendant was complaining of injuries, Remington did not perform a field-sobriety test.

Remington testified that he remained by defendant's side until rescue personnel arrived, followed the rescue vehicle that transported defendant to Rhode Island Hospital, and remained with defendant in the hospital trauma room until defendant was taken into the operating room. In the trauma room, Remington again advised defendant of his right to refuse chemical testing and asked defendant whether he wanted to speak with a lawyer. According to Remington, defendant indicated that he did wish to speak with an attorney before submitting to a chemical test. Remington further testified that when Remington was unable to reach either of defendant's lawyers, defendant indicated that he would not speak with police any further or submit to any chemical testing.

Martins and her five passengers were also transported by ambulance to Rhode Island Hospital where one passenger, John Maki, died on the operating table and the remaining individuals were treated for a variety of injuries.

On October 26, 1990, defendant was charged by indictment with ten counts arising out of the August 3, 1990 automobile accident; on June 9, 1992, defendant was charged by information with two additional counts, and on July 10, 1992, the state's motion to consolidate was granted. A jury-waived trial was held in the Superior Court over five days in December 1993 and January 1994.

At trial, Martins testified that she had no recollection of the accident and was unable to estimate the speed at which she was driving when the accident occurred, although two of her passengers, Kimberly Capparelli Falco (Capparelli Falco) and Lee Lund (Lund) testified that Martins was traveling at a speed between fifteen and twenty-five miles per hour at the time of the collision. The defendant presented expert testimony by Roland Burt (Burt), an accident-reconstruction expert, who concluded that defendant's vehicle was traveling at a "reasonable and prudent" speed, "consistent * * * with his having stopped for the stop sign" and that the accident was directly attributable to unreasonable speed on the part of Martins's vehicle, which he concluded was traveling at a rate of approximately fifty miles per hour.

In rebuttal, the state presented the testimony of Marc Richman, Ph.D. (Richman), a professor of engineering at Brown University and a consultant concentrating in forensic engineering. Richman concluded that defendant's vehicle was probably traveling at a speed in excess of forty miles per hour and Martins's vehicle at approximately twenty to twenty-five miles per hour at the time of the accident.

On January 11, 1994, the state dismissed, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure, one count of driving to endanger, personal injury resulting, and one count of driving under the influence, serious bodily-injury resulting. The trial justice found defendant guilty on all the remaining counts, and defendant was sentenced on March 15, 1994.

## Admission of the Results of the Blood Serum Alcohol Test

In his appeal, defendant contended that the results of his blood-serum alcohol test at Rhode Island Hospital were improperly admitted into evidence. Under G.L.1956 § 31–27–2(c), as amended by P.L.1990, ch. 496, § 1, the results of blood-alcohol tests in criminal prosecutions for driving under the influence of alcohol are admissible only on condition that

"(1) The defendant has consented to the taking of the test upon which the analysis is made.

* * * * * *

"(3) Any person submitting to a chemical test of blood * * * shall have a true copy of the report of the test result mailed to him or her within thirty (30) days following the taking of the test.

"(4) The test was performed according to methods and with equipment approved by the director of the department of health of the state of Rhode Island and by an authorized individual.

* * * * * *

"(6) The person arrested and charged with operating a motor vehicle while under the influence of intoxicating liquor * * * in violation of subsection (a) of this section was afforded the opportunity to have an additional chemical test and the officer arresting or so charging the person informed the person of this right and afforded him or her a reasonable opportunity to exercise the same, and a notation to this effect is made in the official records of the case in the police department. Refusal to permit an additional chemical test shall render incompetent and inadmissible in evidence the original report." [1]

In the instant case, defendant refused to submit to any chemical testing by police, and no such analysis was undertaken by the police. In fact, when Remington returned to the police station, he completed an affidavit that charged defendant with refusal to submit to a chemical test, pursuant to § 31–27–2.1, as amended by P.L.1990, ch. 329, § 1, which statute sets forth the penalty for such refusal.

At trial, however, the results of a blood-serum alcohol analysis performed by medical personnel on the night of the accident were admitted into evidence. Diane Gruber, M.D. (Gruber), the surgical resident in charge of the Rhode Island Hospital trauma unit on the night of the accident, testified that defendant's blood-alcohol level was 0.281 percent, that no alcohol was detected in Martins's blood, and that none of the occupants of Martins's vehicle who were tested had blood-alcohol levels over 0.044 percent. Gruber further testified that defendant's blood was drawn sometime between 2 and 2:21 a.m., and she opined to a reasonable degree of medical certainty that defendant's blood-alcohol level would have been higher an hour earlier.

Jerome Verbinnen (Verbinnen), a pathology technologist at Rhode Island Hospital, performed the blood-alcohol analysis on the sample drawn from defendant. Verbinnen testified that the 0.281–percent figure actually reflected the results of a blood-serum alcohol test as opposed to a total blood-alcohol-level test. Because blood-serum alcohol levels average approximately 16 percent higher than total blood-alcohol levels, which are reduced by the mass accounted for by the blood cells themselves, defendant's blood-alcohol level for legal purposes was actually 0.242 percent rather than 0.281 percent.

The defendant contended that because he did not consent to the testing and because the other conditions set forth in § 31–27–2 were not met, the trial justice erred in admitting the results of defendant's blood-alcohol level into evidence. The state, on the other hand, argued that because the test was performed by hospital personnel rather than by police, § 31–27–2 was not applicable under this Court's holding in *State v. Lussier*, 511 A.2d 958 (R.I.1986). At Lussier's trial, medical personnel testified that a strong odor of alcohol emanated from Lussier at the

---

1. Inapplicable portions of the statute, including those pertaining to breath-analysis tests, have been omitted.

scene of the accident and at the hospital; the emergency-room physician ordered a blood-alcohol analysis. The laboratory technician testified that a blood-alcohol level of 0.177 percent was measured. *Id.* at 958.

Lussier's appeal challenged the trial justice's denial of his motion to suppress the use of the hospital records and argued that the trial justice had erred in refusing to instruct the jury that in order to find Lussier guilty, the jury had to find that Lussier had consented to the testing of his blood and/or that the other conditions set forth in § 31–27–2(c) had been satisfied. 511 A.2d at 961. In rejecting that argument, we pointed out that "the records that were produced in court were the result of actions taken by hospital personnel rather than those taken under the supervision of some law enforcement agency." *Id.* at 961. By so ruling, this Court established a bright-line distinction between records that were the "results of actions taken by hospital personnel * * * [and] those taken under the supervision of some law enforcement agency." *Id.* In *State v. Presler*, No. 95–722–C.A. (R.I. order, filed May 16, 1996), we affirmed our holding in *Lussier*, and concluded that § 31–27–2 does not apply to blood tests performed by private health-care providers for the purpose of administering medical treatment.

■ In the case before us, defendant was admitted to the hospital and subjected to exactly the same procedure as that administered to every other trauma victim admitted in the course of emergency treatment. In Gruber's words, "There's a very systemized way of taking care of patients injured severely enough to belong in a trauma room" because "[t]here are standing [*sic* ] things that we need to know in order to properly take care of a trauma patient." Gruber testified that the drawing and the testing of blood, including a blood-alcohol measurement, are standard requirements of the routine protocol. She explained that a blood-alcohol anal-

ysis is necessary because a patient who is intoxicated may have an "impaired sensorium" and thus be incapable of providing medical personnel with information essential to his or her proper treatment. Thus, because the blood-alcohol analysis was directed and performed by hospital personnel and not by law-enforcement officials, we conclude that defendant's blood-alcohol level was properly admitted pursuant to *Lussier*.

We are of the opinion that the purpose of § 31–27–2 is to render inadmissible the results of chemical tests carried out under the supervision, direction, and authority of the police or law-enforcement officials in the event that the requirements of that statute are not satisfied. Therefore, we hold that the statute is inapplicable to the facts in the instant case in which chemical tests were administered by hospital personnel in the ordinary course of administering medical treatment.[2]

## Court's Findings of Guilt

■ The defendant next asserted that the trial justice's factual findings were not supported by the evidence and that he erred in finding defendant guilty as charged. The factual findings of a trial justice sitting without a jury in a criminal proceeding are accorded great weight on review by this Court, and those findings on the merits will not be disturbed unless the justice has overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. Champagne*, 668 A.2d 311, 313 (R.I.1995); *Capital Properties, Inc. v. State*, 636 A.2d 319, 323 (R.I.1994).

In finding defendant guilty of driving under the influence of alcohol, the trial justice considered Remington's testimony concerning his observations that defendant was intoxicated at the scene of the accident. The trial justice also considered entries in defendant's medical record that defendant had "alcohol on [his] breath" and was "intoxicated"

2. In *Bartlett v. Danti*, 503 A.2d 515, 517 (R.I. 1986), this Court held that provisions of the Confidentiality of Health Care Information Act, G.L.1956 § 5–37.3–6, which exempted confidential health-care information from the compulsory legal process, impermissibly intruded on the judicial function. This Court has further held that the Privileged Communications Act, G.L.1956 § 9–17–24, which prohibited a health-care provider from testifying concerning information obtained about a patient without the consent of the patient, represented an unconstitutional intrusion upon the function of the judiciary. *State v. Almonte*, 644 A.2d 295 (R.I.1994).

when he was admitted to the hospital. Finally, the trial justice considered the results of defendant's blood-alcohol analysis. The trial justice accepted Gruber's testimony that "a person who is intoxicated might still appear, to all outward appearances, sober" and found that although defendant "may have had the wherewithal to communicate with hospital personnel, or to ask that his attorney be telephoned [such behavior] in no way lessens the level of his intoxication as demonstrated by chemical analysis."

Moreover, as *Lussier* explicitly pointed out:

"[T]he issue is no longer whether a defendant was intoxicated or whether he or she was 'under the influence of liquor' or whether someone's driving ability was impaired in any fashion. Presumptions have been discarded. *The single, decisive issue is whether a motor vehicle is being operated by a driver whose blood-alcohol concentration equals or exceeds one-tenth of one percent.*" (Emphasis added.) *Lussier*, 511 A.2d at 960.

The trial justice went on to note that under our holding in *State v. Lusi*, 625 A.2d 1350 (R.I.1993), the trier of fact may draw an inference from the results of a breathalyzer test[3] that the blood-alcohol content at the time of the test was the same as at the time of the actual driving. On the basis of this permissible inference and on Gruber's testimony, the trial justice found that defendant was intoxicated at the time of the collision. There is no evidence on the record before us to suggest that the trial justice misinterpreted the result of a blood-serum alcohol test as being that of a whole blood-alcohol test. Rather, the trial justice expressly acknowledged that the result of defendant's blood-alcohol analysis was measured as 0.241 percent some seventy-five minutes after the accident and commented that the blood-alcohol level at the time of the accident "would have actually been higher than the level which was later found at the hospital." In sum, the trial justice found that the testimony of Remington and Gruber and the observations of the admitting physician, taken together with the result of the blood-alcohol analysis, supported beyond a reasonable doubt the conclusion that defendant was driving under the influence of alcohol when the accident occurred.

The trial justice also found that defendant was driving in excess of the speed limit while traveling past the stop sign on Princess Avenue before colliding with Martins's vehicle. In reaching this conclusion, the trial justice relied on photographs that depicted the nature and the extent of the damage to the two vehicles and on the expert testimony of Richman. The trial justice found that Richman was a credible witness with impressive credentials, and he expressly pointed out that Richman's testimony fully supported the conclusion that defendant was "speeding" at the time of the collision. The trial justice rejected Burt's testimony, after finding that it was inconsistent with the physical evidence depicted in the photographs. The trial justice found that Lund's and Capparelli Falco's testimony that Martins had slowed her car to approximately fifteen to twenty miles per hour at the time of the collision and Capparelli Falco's testimony that she saw defendant run the stop sign before colliding with Martins's car were credible and were consistent with both Richman's expert testimony and the damage recorded in the photographs.

The trial justice went on to find that speeding through a stop sign in a residential area amounted to "heedless indifference to the consequences of one's actions and a wanton disregard for the safety of others." This finding, combined with the finding that defendant was intoxicated, led the trial justice to conclude that beyond a reasonable doubt defendant was driving in a reckless manner. On the basis of the medical records received in evidence and Gruber's testimony, the trial justice then found that defendant's criminal operation of his automobile caused John Maki's death and caused serious bodily injuries to the other passengers in Martins's car.

Our review of the record revealed that in finding defendant guilty, the trial justice carefully and thoroughly considered all the

---

3. General Laws 1956 § 31–27–2(b)(1) establishes as equally valid, for purposes of that section, "a chemical analysis of a blood, breath, or urine sample."

testimony and evidence presented at trial. Because the trial justice neither overlooked nor misconceived material evidence nor was otherwise clearly wrong in his determination, we shall not disturb his finding that defendant was guilty.

### Trial Justice's Refusal to Enter Defendant's Expert's Report into Evidence

At the conclusion of Burt's testimony, defendant moved to introduce Burt's report into evidence, and the state objected. The trial justice refused to admit the report into evidence, ruling that it constituted inadmissible hearsay and that several statements in the report were irrelevant or improper.

It is well settled that the determination of the admissibility of expert testimony rests within the discretion of the trial justice, and this Court will not disturb a trial justice's finding on the admissibility of expert testimony, *State v. Capalbo*, 433 A.2d 242, 246–47 (R.I.1981); *State v. Anil*, 417 A.2d 1367, 1373 (R.I.1980), or the justice's determinations on whether a given expert is qualified to testify on a particular subject, *State v. Ordway*, 619 A.2d 819, 823 (R.I.1992), absent an abuse of that discretion.

■ In the instant case, the trial justice allowed Burt, who was qualified as an accident-reconstruction expert, to present extensive testimony concerning the cause of the accident. The trial justice determined, however, that Burt's report was a prior consistent statement and thus constituted inadmissible hearsay. Moreover, the trial justice found that Burt's report improperly commented on the credibility of another witness's testimony and also proffered irrelevant medical opinion. We are persuaded that the trial justice acted well within his discretion when he refused to admit Burt's report into evidence.

### Propriety of the Sentence Imposed

It is well settled that, in the absence of "extraordinary circumstances," this Court will not consider the validity or the legality of a sentence on direct appeal. *State v. Brigham*, 638 A.2d 1043, 1046 (R.I.1994). Rather, we have repeatedly held that the proper procedure for a review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure. *State v. McVeigh*, 660 A.2d 269, 276 (R.I. 1995); *State v. Baptista*, 632 A.2d 343, 345 (R.I.1993); *State v. Tiernan*, 605 A.2d 1328, 1329 (R.I.1992); *State v. Trepanier*, 600 A.2d 1311, 1315 (R.I.1991). In the event that a defendant continues to be aggrieved by the ruling of the Superior Court, this Court then will review the decision on appeal. *Trepanier*, 600 A.2d at 1315.

■ In the case before us, the defendant did not file such a Rule 35 motion. Because no issue amounting to an extraordinary circumstance was raised on appeal, the absence of a Superior Court decision pursuant to a Rule 35 motion precludes this Court's consideration of the defendant's challenge to his sentence, *Brigham*, 638 A.2d at 1047, and therefore, the defendant's appeal on this issue is denied and dismissed without prejudice.

To summarize, we conclude that the trial justice did not err in admitting into evidence the results of the defendant's blood-alcohol analysis, in refusing to admit into evidence the written report of the defendant's accident-reconstruction expert, and in finding the defendant guilty as charged. Therefore, we deny and dismiss the defendant's appeal and affirm the judgment of the Superior Court, to which we remand the papers in this case.