STATE

v.

**Jeffrey BETTENCOURT.**

No. 97–53–C.A.

Supreme Court of Rhode Island.

Jan. 6, 1999.

Lauren Sandler Zurier, Asst. Attorney General, Aaron Weisman, Asst. Attorney General, for plaintiff.

Lauren E. Jones, Jean Rosiello, John A. Macfadyen, III, Providence, Francis P. Castrovillari, Cranston, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, J.

Following his conviction by a Superior Court jury trial on two counts of driving so as to endanger, death resulting (G.L.1956 § 31–27–1), and after sentence and final judgment entered thereon, Jeffrey Bettencourt (defendant) appeals to this Court seeking reversal of his convictions and a new trial.

The defendant asserts on appeal that the trial justice erred by (1) admitting into evidence (a) a photograph of one of the decedents, (b) the medical testimony of the medical examiner, Dr. Sicerica, (c) the lay opinions concerning the speed of the defendant's truck at the time of the incident and limitations placed on the cross-examination of the lay witnesses' estimates of speed, and (d) expert opinion concerning speed; (2) the trial justice's denial of the defendant's motion for a new trial; and (3) the·

propriety of the sentences imposed by the trial justice. In addition, the defendant requests this Court to review the trial court's in-camera inspection of sealed medical records to determine whether the trial court was correct in concluding after an in-camera review, that the medical records contained nothing of relevance that would assist the defendant's cross-examination of the state's witnesses. For the reasons stated below, we deny the defendant's appeal and affirm the judgment of conviction. The facts insofar as relevant to the issues raised in this appeal are related below.

### Facts and Procedural History

On Friday, June 30, 1995, six young women and two young men left Fairfield, Connecticut to go to a rock concert in Mansfield, Massachusetts. At approximately 3:30 p.m., as the group was traveling on Interstate Route 95 in two cars—a Jeep Wrangler and a Ford Taurus—the right rear tire of the Jeep blew out in the far left lane of a straight away just north of Jefferson Boulevard in Warwick. Traffic was heavy on this clear day, so Liz Daily (Liz), the driver of the Jeep, pulled over into the left median shoulder. The median shoulder was nine feet wide. The Taurus pulled in behind the Jeep, and the flashing emergency lights of both cars were activated. The Jeep then was moved so that its left wheels were touching the Jersey barrier that divided the highway, and the two young men, David Tippett (David) and Richard Nolfi (Richard), began changing the tire.

Four of the young women stood between the cars while the remaining two young women, Amber Austin (Amber) and Liz, positioned themselves behind the Taurus and close to the yellow fog line that separated the median shoulder from the left travel lane. From there, they directed oncoming traffic away from the parked vehicles by waving their arms. Traffic responded to their signaling by slowing down and pulling over into the next travel lane. Approximately ten minutes later, however, a yellow pick-up truck driven by the defendant entered the far left lane and proceeded for one half mile passing general traffic at a speed somewhere between sixty and eighty miles per hour.[1] The yellow pick-up truck veered into the left median shoulder causing Amber and Liz, who had been attempting to signal the driver, to jump out of the way. The truck first hit the side of the Taurus and then hit Richard and David leaving them mangled together, Richard on top of David, approximately fifty feet beyond the Jeep in the median shoulder. After hitting the Jeep, the yellow truck grated the Jersey barrier a further 400 feet, knocking over a utility pole before finally stopping. David was killed instantly; Richard died at a hospital shortly thereafter.

At the Grand Jury proceedings, the defendant testified that he entered Interstate I–95 at the airport connector, then crossed over four lanes into the far left lane so that he could make the best time possible through a construction site that lay ahead. The distance from the airport connector to the location of the Taurus was estimated to be six-tenths of a mile. The defendant also stated that the nearest vehicle in his lane of travel was approximately one quarter-mile ahead.

At trial, the defendant testified that although traffic in the travel lane slowed down for what he believed to be no apparent reason, he continued to travel at approximately sixty miles per hour. He testified that he then noticed a purple Saturn or sports car activate its directional light and attempt to pull out in front of him.[2] The defendant testified that rather than slowing down, he attempted to avoid the purple car by veering

---

1. The defendant admitted to traveling at approximately sixty miles per hour. The young girls who witnessed his approach put his speed at between sixty-five and eighty miles per hour. In estimating the speed of the truck after the point of impact, the prosecution's accident reconstruction expert, Corporal Giardina of the Rhode Island State Police, concluded that the defendant was traveling at sixty-eight miles per hour and the defendant's own expert, Jeffrey Muttart, determined it to be sixty-three to sixty-five miles per hour. The posted speed limit in that area was fifty-five miles per hour.

2. At the scene of the accident, the defendant made no mention to the police of there being any other car involved in the incident. It was only at the police station that he stated that a purple car attempted to enter his lane. The first time he indicated that the purple car was a sports car or a Saturn was at trial.

to the left. He testified that it was only after the purple car had pulled back into its proper lane and the defendant had pulled alongside, that he looked up and saw the Taurus and the young people. In the statement he made to the police, however, one and one-half hours after the collision, the defendant was able to describe vividly what he had observed ahead of him in the high-speed breakdown lane as he was approaching the Taurus. He described two cars and five people, three of whom were near the barrier and two of whom were close to the lane of travel. He described a female wearing a white top and a white hat who was standing towards the back of a gray Ford Taurus, and a second female with dark clothes and dark hair standing near the barrier. He stated that both the Taurus and a black Jeep were "in the high speed breakdown lane, but close to the travel lane." At trial, the defendant testified that the Taurus "was close to the lane, it was, like, on the line." When pressed for details on cross-examination, the defendant stated, "I have to say it was very close, maybe possibly over slightly. I, you know, I know I was in my lane of travel, and I hit it." The defendant admitted to telling the investigating officer at the scene that the Taurus was inside the breakdown lane. At trial, he testified that as he was attempting to swerve to the right, the protruding left rear tool box of his truck caught the right rear of the Taurus, causing his truck to spin counter-clockwise, crash into the disabled Jeep, and slide along the barrier.

Additional facts will be supplied as needed.

### Analysis

The defendant appeals his jury conviction of two counts of driving to endanger, death resulting, pursuant to G.L.1956 § 31–27–1.[3] Before addressing the merits of the defendant's appeal, we first must consider application of the reckless driving statute.

 "Conviction under the reckless-driving statute requires evidence that the

defendant embarked on a course of conduct demonstrating a heedless indifference to the consequences of his act." *State v. Dionne,* 442 A.2d 876, 883 (R.I.1982); *see In re David P.,* 697 A.2d 1099, 1100–01 (R.I.1997) (per curiam). "Mere error in judgment by a driver is not sufficient for conviction; neither is the negligence that could support a civil action on damages." *Dionne,* 442 A.2d at 883. "Recklessness, like negligence, must be related to time, place, persons and surrounding circumstances and be measured by them. Excessive speed under some circumstances may amount to mere negligence and under other circumstances it may constitute willful or wanton disregard of the safety of others." *State v. Lunt,* 106 R.I. 379, 383, 260 A.2d 149, 152 (1969).

 Thus, "in order to sustain a conviction for a reckless homicide under § 31–27–1 * * * the accused must have known or should have known that his manner of driving created an unreasonable risk of harm but he need not have intended to cause such harm. Intentional conduct, not intentional harm, is what is proscribed by [this] statute[ ]." *Lunt,* 106 R.I. at 382, 260 A.2d at 151.

With this standard in mind, we now may analyze the merits of the defendant's various arguments.

### 1. Admission of Evidence

#### (a) The Photograph

Prior to trial, the defendant moved to exclude any and all photographs depicting the injuries of the two victims on grounds that their probative value was substantially outweighed by the danger of unfair prejudice pursuant to Rule 403 of the Rhode Island Rules of Evidence. The defense argued that introduction of such photographs would be unnecessary to prove death or causation because it intended to concede that the defendant was operating the truck that struck and killed Richard and David. In response, the

---

**3.** General Laws 1956 § 31–27–1 provides:
 "Driving so as to endanger, resulting in death.—(a) When the death of any person ensues as a proximate result of an injury received by the operation of any vehicle in reckless disregard of the safety of others, the person so operating the

vehicle shall be guilty of 'driving so as to endanger, resulting in death.'
 (b) Any person charged with the commission of the foregoing shall upon conviction be imprisoned for not more than ten (10) years."

prosecution argued that it only intended to introduce one photograph of David's body for the purpose of showing the jury "the relevant positions of the people and vehicles in order to illustrate the testimony testified by our experts and respondent at the scene."[4] Subsequently, the defense requested the trial court to cover that portion of the photograph that depicted David's face. After examining the photograph, the trial justice denied the motion finding that it was material, relevant, and not being introduced solely to inflame the jury.

At trial, the contested photograph was admitted as one of a series of photographs presented during the testimony of Kenneth Marandola, the first Rhode Island State Trooper to arrive at the scene. After estimating that David's body was located approximately twenty-five feet in front of the Jeep, Trooper Marandola testified that the photograph fairly and accurately depicted that location. At this point, defense counsel objected without stating the grounds for such objection.[5] In later testimony, State Police Corporal Matthew Giardina, who arrived at the scene after the victims had been removed, testified that the measured distance between the Jeep and the bodily fluids in the median shoulder was fifty-one feet.

On appeal, the defendant alleges that the trial justice abused her discretion in admitting the photograph, claiming that its probative value did not outweigh any undue prejudice. In addition, the defendant asserts that the photograph failed to show the relative location of the body to the collision scene, and that none of the state's witnesses used or referred to the photograph for any purpose.

The state maintains that because defense counsel asserted only a general objection at trial, the defendant cannot argue on appeal that the photograph was not a true and

accurate representation of the accident scene. The state also contends that the probative value of the photograph outweighed any undue prejudice. Specifically, the state argues that even if defense counsel did stipulate to the cause of death, the state was entitled to introduce the photograph in order to prove that element of the crime, as well as to allow the jury to determine recklessness, by observing the location of the body from the point of impact, and by noting the extent of the injuries.

Rule 103 of the Rhode Island Rules of Evidence provides in pertinent part:

"(a) *Effect of Erroneous Ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context * * *."

When construing this provision, this court reasserts that when, at trial, "the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may not be raised for the first time on appeal." *State v. Neri*, 593 A.2d 953, 956 (R.I.1991). "According to our well-settled 'raise or waive' rule, issues that were not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.'" *State v. Toole*, 640 A.2d 965, 972–73 (R.I. 1994) (citing *State v. Warren*, 624 A.2d 841, 842 (R.I.1993)). Another basic rule of our appellate practice is that this court will not review objections that were not raised at trial. *Toole*, 640 A.2d at 973 (citing *State v. Burke*, 529 A.2d 621, 627 (R.I.1987)). "Con-

---

**4.** The photograph in question depicted a disturbing portrayal of David's body and bodily fluids located in the median shoulder alongside the skid-marked barrier.

**5.** The relevant testimony reads:
"Q. Showing you State's 11 for identification purposes, can you tell us what it is?
"A. One of the victims in the 95 North breakdown lane.

"Q. Is that the victim you described to us that you observed some number of feet in front of the Jeep when you arrived?
"A. Yes.
"Q. Does that photograph fairly and accurately depict the location of the victim when you arrived on the scene?
"A. Yes.
"MR. CASTROVILLARI: Objection."

sequently, allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level." *Toole,* 640 A.2d at 973.

In the instant matter, like *Toole,* the defense counsel asserted a general rather than a specific objection at trial; therefore, the objection has not been preserved for appeal. However, even if we were to overlook this procedurally fatal error and proceed directly to a substantive analysis of the defendant's appeal, we are of the opinion that his arguments must also fail on the merits.

"It is within the trial court's discretion to determine the materiality or relevance of photographs." *State v. Rivera,* 640 A.2d 524, 526 (R.I.1994) (citing *State v. Correia,* 600 A.2d 279, 284 (R.I.1991)). "A photograph is relevant if it has a tendency to 'prove or disprove some material fact in issue.'" *Id.* (citing *State v. Barnville,* 445 A.2d 298, 301 (R.I.1982)); *see also* Rule 401 of the Rhode Island Rules of Evidence. "Our function is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.'" *State v. Griffin,* 567 A.2d 796, 801 (R.I.1989) (quoting *State v. Ware,* 524 A.2d 1110, 1113 (R.I. 1987)); *see also State v. Lionberg,* 533 A.2d 1172, 1180 (R.I.1987). "In criminal cases photographs are admissible for numerous reasons, such as displaying the extent of the injury or identifying the body and its condition." *State v. Correia,* 600 A.2d 279, 285 (R.I.1991) (citing *State v. Ryan,* 113 R.I. 343, 350, 321 A.2d 92, 96 (1974)). Thus, "[p]hotographs that are faithful representations of the victim at the time in issue are admissible in the court's discretion." *State v. Beauchamp,* 671 A.2d 1238, 1241 (R.I.1996) (per curiam) (citing *Rivera,* 640 A.2d at 526). "The test is whether the photograph is 'of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt.'" 671 A.2d at 1241 (quoting *State v. Fenner,* 503 A.2d 518, 526 (R.I. 1986)).

The defendant argues that because he stipulated that his truck caused the victims' death, it was not necessary to introduce the photograph to show cause of death. We find this argument to be without merit. "When the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt, even if some of those elements may not be disputed. Because of this burden, the state has the right to establish the existence of those elements as it deems just." *State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993) (citing *Lionberg,* 533 A.2d at 1180). In the case at bar, the charge of driving to endanger, death resulting, requires a finding that the accused caused the deaths of the victims. Section 31–27–1(a). Because it is incumbent upon the state to prove this element beyond a reasonable doubt, we find that the use of the photograph offered probative evidence of such deaths.

In addition, the prosecution introduced the photograph as one of a series of photographs to show the relevant positions of the people and vehicles at the scene. The disputed photograph shows skid marks on the barrier and bodily fluids on the road. These marks are also evident in other photographs where the relative location of the vehicles is observable. Thus, although disturbing, the photo does in fact give the viewer a clear view as to where the bodies landed in relation to the Jeep. In addition, Corporal Giardina's testimony concerning his measurements from the Jeep to the bodily fluids provides the exact distance from the Jeep that David and Richard landed, clarifying conflicting guesses of that distance. Such evidence is more probative than prejudicial and may have helped the jury to conclude that under the circumstances, the truck was traveling at an excessive and reckless speed.

**(b) Medical Examiner's Testimony**

At trial, Dr. Michael Sicerica, a part-time medical examiner for the State of Rhode Island, described the extent and grav-

ity of the victims' injuries in detail and made conclusions as to the cause of death. Such testimony corroborated eyewitness testimony that the defendant's truck was traveling at high speed. This testimony may have led the jury to conclude that the defendant was traveling in a reckless manner. *See Government of the Virgin Islands v. Caines,* 512 F.2d 311, 315 (3d Cir.1975) (sustaining a charge of reckless driving by combining excessive speed with other incriminating circumstances).

The probative value of both the photograph and the medical examiner's testimony was not outweighed by any undue prejudice, and the trial justice's decision to admit this evidence was not an abuse of her discretion.

### (c) Location of the Taurus

At trial, all witnesses testified that the Taurus was located within the left median shoulder or breakdown lane.[6] The defendant asserts that he was prevented from impeaching one of the witnesses, Brittany Doon (Brittany), with her Grand Jury testimony during which she had conceded that the Taurus was right on the line. The defendant argues that this was a clear error on an absolutely critical point, because it could have lent support to his assertion that the Taurus was protruding into the travel lane and hooked the truck's rear toolbox. The defendant contends that the trial justice violated the confrontation clause and denied him his right to a fair trial by precluding proper impeachment by use of a prior inconsistent statement. The state counters that the defendant attempted to impeach Brittany by asking her a misleading question, and that the trial justice properly sustained its objection.

During the Grand Jury proceedings, Brittany testified as follows:

"Q. And how about the Taurus? Was that right up against the barrier?

"A. No, that was over, like right—like his tire—like the side of his car was right on like the lane. Like the left lane.

"Q. Okay. In the breakdown lane?

"A. Yeah.

"Q. But right on the line there?

"A. Yeah."

At trial, Brittany testified on cross-examination that the Taurus was "[b]asically, maybe a little more to the right, but it was basically in the middle." At that point, defense counsel questioned her regarding her Grand Jury testimony:

"Q. Now do you recall testifying before the grand jury?

"A. Uh, huh.

"Q. And do you recall being asked a question on page ... and the question was 'How about the Taurus, was that right up against the barrier?' And you answered, 'No, that was over, like his tire, like the side of his car was right on like the lane, like the left lane' and then the question was asked by Mr. Dambruck [*sic* ], 'In the breakdown lane right on the line?' And you answered, 'yes.'

"Q. Do you remember that?

"A. As I said, it was more to the right."

Defense counsel then asked Brittany:

"Q. Okay. But do you remember telling the grand jury that *the tire was right on the line?* " (Emphasis added.)

The trial court sustained the state's objection. Defense counsel did not further attempt to impeach Brittany by any different line of questioning.

 "[A] criminal defendant is constitutionally guaranteed the right to an effective cross-examination of the prosecution's witnesses." *State v. Brown,* 709 A.2d 465, 473 (R.I.1998); *see also State v. Doctor,* 690 A.2d 321, 327 (R.I.1997); *State v. Anthony,* 422 A.2d 921, 923–24 (R.I.1980). "However, the scope of cross-examination is subject to reasonable limitation by the trial justice's exercise of his or her sound discretion." *Brown,* 709 A.2d at 473 (citing *State v. Bowden,* 473 A.2d 275, 279 (R.I.1984)). "And a trial justice may exercise this discretion to narrow the questioning as long as he or she

**6.** While all referred to the lane as being the breakdown lane, which is usually to the right of the highway, the lane in question was the left shoulder median or left breakdown lane nearest the concrete Jersey barrier that separated incoming from outgoing traffic.

does not 'unduly restrict' a defendant's cross-examination right." *Id.* (citing *Anthony*, 422 A.2d at 924); *see also Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353–54 (1974). The court has a "duty to protect [a witness] from questions that go beyond the proper bounds of cross-examination." *Anthony*, 422 A.2d at 924. "Questions exceeding the proper limits of cross-examination are those that harass, annoy, or humiliate the witness, or questions that are irrelevant or offer no probative value." *Id.* In addition, during the course of cross-examination, counsel has an obligation not to mislead or attempt to confuse the jury. *See State v. Sabetta*, 680 A.2d 927, 936 (R.I.1996). "Questions of this nature are subject to the control of the trial justice." *Anthony*, 422 A.2d at 924.

"[T]his court has determined that the exercise of discretion by the trial justice in limiting the scope of cross-examination will not be disturbed except for clear abuse, and then only when such abuse constitutes prejudicial error." *Id. See also Burns v. Janes*, 121 R.I. 343, 350, 398 A.2d 1125, 1128–29 (1979); *State v. Sprague*, 113 R.I. 351, 364, 322 A.2d 36, 43 (1974); *State v. Carraturo*, 112 R.I. 179, 189, 308 A.2d 828, 833 (1973).

▌▌▌▌ Here we conclude that the defendant misquoted in part the witness's Grand Jury testimony by implying that she had testified only that the tire was on the line when the witness also had stated that the Taurus "was right on like the lane. Like the left lane." Thus, the trial justice's restriction of that question was neither a clear abuse of her discretion nor prejudicial error necessitating a new trial. In addition, even if this had been an error, such error would have been harmless error because Brittany's exact grand jury testimony was eventually admitted for consideration by the jury. Indeed, the jury may have concluded that the defendant was driving in a reckless manner under the totality of the circumstances, despite the fact that it may have believed that the Taurus was actually on the line separating the lanes.

**(d) Lay Opinion Concerning Speed**

At trial, three of the young women who had witnessed the collision—Amber, Brooke Englehardt (Brooke) and Liz—estimated the speed at which the defendant had been traveling prior to the collision. A fourth witness, Theresa Brennan, testified that the defendant's truck had been traveling "fairly fast." Subsequently, the defendant moved to dismiss on the grounds that (1) none of the witnesses had enough time to view the defendant's vehicle; and, (2) there was no "basis for these opinions." The trial court denied the motion. In ruling on the motion, the trial court stated:

"Our Supreme Court has held that it is permissible for lay witnesses to testify as to speed estimates. What you say about their opportunity to observe and view the vehicle goes to the weight of the testimony and not to its admissibility. It's within the jury's discretion to determine whether or not they had sufficient opportunity to observe the car and whether or not their estimates are accurate."

On appeal, defendant asserts that because the state did not lay a proper foundation for the introduction of lay opinion on the issue of speed, the trial court improperly admitted that testimony. The defendant argues that because the witnesses had never previously stood on the center median of a superhighway to estimate speed, they were not in a position to assess the speed of any of the vehicles that were passing on the day of this incident, much less the speed of the truck. In addition, the defendant implies that because the witnesses were under conditions of stress and fear, their estimates were likely distorted. At trial, the trial court rejected similar arguments, noting that lay witnesses may give estimates of speed in numerical terms as long as the defendant's precise speed is not an element of the crime.

The state contends that the proper time to have challenged the reliability and accuracy of the lay witnesses' estimates of speed was during cross-examination, and that any inconsistencies between their estimates only would affect the weight to be given their testimony. Moreover, the state asserts that any error in admitting the lay witnesses'

estimates of speed was harmless, since the central issue was not how fast the defendant was traveling, but whether at the time of the incident, he was traveling at a speed greater than the circumstances warranted.

Rule 701 of the Rhode Island Rules of Evidence states the following:

"Opinion testimony by lay witnesses.—If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

■■■ Opinion testimony may be rendered when " 'the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time, and the facts upon which the witness is called to express an opinion are such that [persons] in general are capable of comprehending.' " *Bowden,* 473 A.2d at 280 (quoting *State v. Lutye,* 109 R.I. 490, 494, 287 A.2d 634, 637 (1972)). Where exact speed is not an issue, a witness need not be qualified as an expert before being allowed to testify as to the speed of a moving vehicle. *See State v. Noble,* 95 R.I. 263, 267, 186 A.2d 336, 339 (1962). "As long as the time and distance of the observation enable the witness to do more than hazard a guess, the testimony is admissible." *State v. Green,* 77 N.C.App. 429, 335 S.E.2d 176, 177 (N.C.App.1985). The brevity of an observation and an approximation of speed go not to the admissibility of the evidence, but to the weight of the evidence and the credibility of the witness. *See Noble,* 95 R.I. at 268, 186 A.2d at 339; *Green,* 335 S.E.2d at 177.

■■■ Here, the *exact* speed of the truck was not the real issue. The real issue was whether the truck was traveling at any speed that could be found to be reckless under the circumstances then existing on the highway. Consequently, the lay testimony was admissible where the young women, from a stationary vantage point, observed the truck approach in relation to the surrounding traffic and where, after trying desperately to wave off the oncoming truck, Amber and Liz were

forced to jump out of its path. Their estimates of speed were based rationally upon their perceptions at the time of the collision and helped to determine a fact in issue, namely, whether the defendant was traveling at a speed that was reckless under the circumstances. The trial justice's admission of the lay witnesses estimates of speed was not error.

**(e) Cross–Examination on Prior Inconsistent Statements Concerning Speed**

The defendant also asserts that he should have been allowed to impeach Brooke concerning her estimate of speed, because her signed statement given to the police did not contain any mention of the speed of the truck. This argument has no merit.

At trial, the trial justice properly noted that Brooke's statement as well as the other police statements, failed to contain any numerical estimate of speed, because "none of the witness reports *** pose[d] the question what was the speed *** they were never asked that question, so therefore, there cannot be an inconsistency in that testimony."

■■■ Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence "admits all prior inconsistent statements as substantive evidence as long as the declarant testifies at trial and is available for cross-examination." *State v. Pusyka,* 592 A.2d 850, 853 (R.I.1991). However, there must be the two statements and each "must be sufficiently inconsistent to render the prior statement admissible." *See id.; State v. Wallace,* 428 A.2d 1070, 1073 (R.I.1981) ("as a preliminary matter the court must be persuaded that the statements are indeed inconsistent"). The determination of whether a pretrial statement is in fact inconsistent with the witness's in-court testimony is a matter left to the sound discretion of the trial justice. *See Pusyka,* 592 A.2d at 853; *State v. Robbio,* 526 A.2d 509, 513 (R.I. 1987); *State v. Cianci,* 430 A.2d 756, 762 (R.I.1981). In this case, Brooke gave no prior inconsistent statement that was contained in the police report. Consequently, the trial justice did not abuse her discretion in precluding the defendant's attempt to create

a prior inconsistent statement that had never been made.

### (f) Expert Opinion Concerning Speed

The defendant next challenges the opinions of the state's expert, Corporal Matthew Giardina of the Rhode Island State Police, on the issue of speed, stating that his qualifications for performing accident reconstruction were limited, and that his conclusions defied the laws of physics. At trial, the defendant did not challenge Giardina's expert witness qualifications.

"The qualification of an expert is a matter addressed to the sound discretion of the trial justice, and the exercise of that discretion will not be disturbed on appeal absent abuse." *DeChristofaro v. Machala,* 685 A.2d 258, 267 (R.I.1996). "Rule 702 permits a witness who is qualified 'by knowledge, skill, experience, training, or education' to testify as an expert." *Id.* "Prior to the admission of expert testimony, a trial justice must consider whether the testimony sought is relevant, within the witness's expertise, and based on an adequate factual foundation. However, once these questions have been favorably determined, the evidence generally ought to be admitted." *Rodriquez v. Kennedy,* 706 A.2d 922, 924 (R.I.1998) (per curiam) (citing *State v. Wheeler,* 496 A.2d 1382, 1388 (R.I.1985)); *see* Rule 705 of the Rhode Island Rules of Evidence. "The facts upon which an expert opinion is based must be specifically set forth; otherwise it is impossible [for the fact finder] to assess whether the conclusions drawn from the facts possess sufficient probative force or, rather, are grounded in mere speculation or conjecture." *DeChristofaro,* 685 A.2d at 267 (citing *Alterio v. Biltmore Construction Corp.,* 119 R.I. 307, 313, 377 A.2d 237, 240 (1977)).

On the date of the collision, Corporal Giardina had been a member of the state police for sixteen years and a member of its commercial enforcement unit since 1987. In 1991, he was made a member of the State Police accident reconstruction team. He had participated in forty-one accident reconstructions, seventeen of which he conducted alone. He had attended a course in computerized drawing as well as courses in accident reconstruction sponsored by the Institute of Police Technology Management at the Massachusetts State Police Training Academy. In addition, he had received on-the-job training from senior accident investigation team members. He had been qualified previously as an accident reconstruction expert in another case and had been a member of the National Association of Professional Accident Reconstructionists since 1991.

On the date of the collision, Corporal Giardina arrived at the scene at approximately 4:15 p.m. Once the scene was secure, Corporal Giardina, with the assistance of other police officers, set about taking detailed measurements: of the relative locations of the vehicles; the distance between the Jeep and bodily fluids on the median shoulder; and the length and curvature of various markings on the road, and on the Jersey barrier. Applying these measurements to established formulae, Corporal Giardina calculated that from the point of impact, and for approximately the next thirty-one feet, the defendant had been traveling at a speed of sixty-eight miles per hour, and that his truck had veered to the left after the impact.

We conclude that Corporal Giardina's training and experience, combined with his first-hand observation of the accident scene, provided sufficient basis to qualify him as an expert witness concerning the speed and direction of the truck. The defendant had ample opportunity to question Corporal Giardina in order to raise doubts concerning the basis of his opinion. Having heard Corporal Giardina's opinion testimony, the jury was called upon to weigh that testimony and accept or reject it in the same manner as all other testimonial evidence in the case. The jurors were capable of independently evaluating the results of Giardina's investigation, and arriving at their own independent conclusions regarding the probative value of Giardina's testimony. *See Pray v. Narragansett Improvement Co.,* 434 A.2d 923, 928 (R.I.1981). The trial justice did not err in permitting Giardina to testify as an expert and to offer his opinion regarding the speed of the defendant's truck at the time of the collision.

## 2. Motion for a New Trial

After trial, the defendant moved for a new trial. As the basis for his motion, the defendant alluded to a number of allegedly prejudicial errors that occurred during trial, but to which the defendant did not timely object. Conceding that Rule 33 of the Superior Court Rules of Criminal Procedure precludes the granting of a new trial for errors of law occurring at the trial, the defendant next posits that this Court should rule that "error of law" refers only to rulings made, or affirmative actions taken, by the trial justice to which a defendant objects. Thus, "passive errors"—actions taken (or not taken) by the trial justice without defense objection—would not be considered true "errors of law" and therefore, could be raised in a motion for a new trial. In rejecting the defendant's motion, the trial justice stated:

"The standard for granting a new trial, at least in the evidentiary sense, is where reasonable minds could differ as to the outcome. In this case the jurors did hear evidence from which they could conclude that Mr. Bettencourt was proceeding in a manner contrary to the statute. There was evidence of speed. There was evidence that all but his vehicle were being waved away in conformity with the two young people, women who had posted themselves to direct traffic away.

"There was obviously from Corporal Giardina concerning the manner of operation, the point of impact and a speed of 68 miles per hour. That testimony was refuted by Mr. Muttart, the defense expert, and as is always the situation in cases such as this, the jury had the right, it was totally within their discretion to reject the testimony of one and endorse the testimony of another which obviously what they did.

"So in the evidentiary sense, because reasonable minds could differ as to what verdict to return, the motion for a new trial is denied."

■ When passing on a motion for a new trial, a trial justice is required to review and evaluate all of the trial evidence and must assess the credibility of each of the trial witnesses. After doing so, the trial justice, in the light of the jury instructions given the jury must then exercise his or her independent judgment upon the evidence and determine if the jury's verdict is a proper response to the trial evidence in light of the charge given. If the trial justice concludes that the verdict is a proper response to the evidence and the charge, or that it is one upon which reasonable minds might differ, the motion must be denied. *See generally State v. Warren*, 624 A.2d 841, 843 (R.I.1993); *State v. Vanasse*, 593 A.2d 58, 67–68 (R.I. 1991); and *State v. Dame*, 560 A.2d 330, 333 (R.I.1989).

■ It is clear from the trial justice's ruling in this case that she exercised her independent judgment in appraising the weight of the evidence and assessing the credibility of the trial witnesses. She properly calculated after doing so that on balance reasonable minds could differ as to the guilt or innocence of the defendant, and on that basis, was required to affirm the jury verdict. She did not err.

■ The defendant's novel argument that, for purposes of a motion for a new trial in a criminal case, "error of law" refers only to rulings made, or affirmative actions taken, by the trial justice to which a defendant objects, is without merit. Rule 33 of the Superior Court Rules of Criminal Procedure provides in pertinent part:

"The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice, except that a new trial may not be granted for error of law occurring at the trial ."

Rule 33 does not make any distinction between an "active" or a "passive" error of law; rather it precludes the granting of new trial for any error of law. In *State v. Bertoldi*, 495 A.2d 247 (R.I.1985), we concurred with the opinion of Mr. Justice Rehnquist, who views:

"the trial of a criminal case in state court as a decisive and portentous event. A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should

be determined in this proceeding: the accused is in the courtroom, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification." *Id.* at 251 (quoting *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594, 610 (1977)).

As noted above, "allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level." *Toole,* 640 A.2d at 973. If we were to permit the defendant's argument, that "error of law" refers only to rulings made, or affirmative actions taken, by the trial justice to which a defendant objects, Rule 33 and the contemporaneous objection rule would be completely eroded. Therefore, we decline the defendant's invitation to interpret Rule 33 to exclude so-called "passive errors".

### 3. Departure from the Superior Court Sentencing Benchmarks

 The defendant also contends that the sentence he received is too harsh, arguing that the trial justice predicated her sentence on an inappropriate criterion, namely his possession of a commercial driver's license. The defendant acknowledges that although he has not pursued a motion to reduce sentence under Super.R.Crim.P. 35, it would be an exercise in futility to do so without first having this Court determine whether or not the original sentence was valid.

As we have stated previously:

"It is well settled that, in the absence of 'extraordinary circumstances,' this Court will not consider the validity or the legality of a sentence on direct appeal. *** Rather, we have repeatedly held that the proper procedure for a review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure. *** In the event that a defendant continues to be aggrieved by the ruling of the Superior Court, this Court then will review the decision on appeal." *State v. Collins,* 679 A.2d 862, 867 (R.I.1996).

In *State v. Brigham,* 638 A.2d 1043, 1047 (R.I.1994), we refused to entertain a direct appeal challenging the length of a sentence imposed after trial because the defendant had not filed a Rule 35 motion and no issue amounting to an extraordinary circumstance was raised on appeal. In that case, like the case before us, the defendant alleged that he received an unlawful sentence because the trial justice "considered improper criteria in imposing the sentence." *Brigham,* 638 A.2d at 1046. Thus, like *Brigham,* we find that because the issue raised does not amount to an extraordinary circumstance, the absence of a determination made pursuant to a Rule 35 motion precludes this Court's consideration of the defendant's challenge to his sentence. The statutory 120–day period in which to seek Superior Court review of the sentence commences on the date of this opinion should the defendant choose to file such a motion; therefore, the defendant's appeal on this issue is denied and dismissed without prejudice.

### 4. In–Camera Review

Lastly, the defendant asks this Court to review the medical records of certain witnesses who received medical counseling after the collision in order to determine whether the trial court erred in concluding that nothing in those records would be relevant to the defendant's case for purposes of cross-examination at trial. The defendant sought information in those records pertaining to any statements made by the witnesses which might have been shown to be inconsistent with their later trial testimony and any records reflecting drug or alcohol use by the witnesses on the day of the collision.

 As we have stated previously, a defendant's constitutional right to confrontation at trial is not absolute and may be restricted in order to protect confidential information. *State v. Holmes,* 715 A.2d 576, 578 (R.I.1998);

State v. Kholi, 672 A.2d 429, 437 (R.I.1996); State v. Parillo, 480 A.2d 1349, 1355 (R.I. 1984); State v. Myers, 115 R.I. 583, 350 A.2d 611 (1976). A trial justice's in-camera review of privileged information strikes the requisite balance between a defendant's constitutional right to effective cross-examination and a witness' right to confidentiality where the trial justice determines relevancy after an in-camera inspection of the pertinent medical records. Kholi, 672 A.2d at 437.

In the case now before us, the defendant sought access to the medical records of certain witnesses who were counseled after the collision. Under this state's Confidentiality of Health Care Information Act, the information requested in the case at bar—statements made by the witnesses to treating physicians and the possible presence of drugs or alcohol in their systems—clearly falls within the definition of "confidential health care information" because the request was designed to obtain "information relating to [these patients'] health care history, diagnosis, condition, treatment or evaluation obtained from a health care provider who [may] ha[ve] treated" them. See G.L.1956 § 5–37.3–3(3); Brown, 709 A.2d at 472 n. 8. "As such, the requested information, even though it may be subpoenaed pursuant to valid legal process, is presumptively private, confidential, and privileged." See Brown, 709 A.2d at 472 n. 8.

The record reflects that the trial justice conducted the necessary in-camera inspection of the sought-after medical records in order to decide the impact of the requested records upon the defendant's right to confront and effectively cross-examine the trial witnesses. See Holmes, 715 A.2d at 578. Accordingly, we deem it inappropriate to independently review the records in question, based on the facts in this case.

For the foregoing reasons, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed and the papers in this case are remanded to the Superior Court. The defendant's appeal from his sentence is denied without prejudice.